UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BILL SURI,                                                           :

                Plaintiff,                                    :

            vs.                                                 :        **COMPLAINT**

THE UNITED STATES OF AMERICA and                         :
BUREAU OF PRISONS,

                                                :
              Defendants.                                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## PRELIMINARY STATEMENT

1.     This is an action in which the Plaintiff, BILL SURI, seeks relief for the

Defendants' violation of the Federal Tort Claims Act ("FTCA"). Plaintiff seeks damages from

the Defendants because he was deprived of essential medical care and attention while

incarcerated by the Bureau of Prisons.

2.     As a result of the aforementioned violations, Plaintiff suffered permanent loss of

mobility, permanent damage to his cardiovascular system, loss of function of the prostate, and

other emotional, mental, psychological, and physical pain and suffering.

## JURISDICTION AND VENUE

3.     Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 and 1346

because the matter in controversy arises under the Federal Tort Claims Act, 28 U.S.C. § 2671, et

seq.

4.     The Eastern District of New York is an appropriate venue under 28 U.S.C. §§

1402(b), 1391(6) because Plaintiff resides in this judicial district.

1

## PARTIES

5.      Plaintiff is a 75-year old man.  He was incarcerated within Bureau of Prison facilities during the time of the incidents described herein.  He was released on April 26, 2016, from BOP custody and underwent spinal surgery on May 17, 2017, when he was informed for the first time his inability to walk was not curable.

6.      Defendant UNITED STATES OF AMERICA is the government entity with jurisdiction and control over the agencies and employees whose wrongful, negligent and deliberately indifferent conduct injured Plaintiff as alleged herein.

7.      Defendant BUREAU OF PRISONS ("BOP") is the Government department and agency that had direct control over its agents, employees and of the Plaintiff.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.      To the extent required, Plaintiff has exhausted his administrative remedies to the best of his ability by pursuing the appropriate processes within the BOP with respect to the claims set forth herein.

15.      The BOP received a copy of Mr. Suri's administrative claim on May 14, 2021, alleging that as a result of the BOP's negligent treatment and lack of care, Mr. Suri suffered permanent injuries to his spine, heart and prostate, and seeking a sum certain of $60,000,000.

.16.      On August 2, 2021, the U.S. Department of Justice mailed a letter directed to Mr. Suri's counsel, denying Mr. Suri's administrative claim and stating that "if you aren't satisfied with this response, you have six months from the date this final denial letter is mailed to file suit in the appropriate United States District Court."

## STATEMENT OF FACTS

17.     Plaintiff is 75 years old; he presently lives alone and is dependent on the assistance of a home health attendant 24 hours per day and 7 days per week. He also is wheelchair-bound.

18.     On or about March 1, 2012, Plaintiff walked into a BOP facility to commence service of his sentence following a conviction in the United States District Court for the Southern District of New York.

19.     On or about April 26, 2016, Plaintiff was released from the custody and control of the BOP, unable to walk and suffering from several life-threatening and debilitating ailments. Mr. Suri then sought medical care at Mt. Sinai Hospital in New York City, and on May 17, 2017, finally obtained the spinal surgery denied to him in prison and which he expected would resolve his mobility issues. Instead, he came to learn following the surgery that due to the delay in treatment, his condition was not curable.

20.     The deterioration of the Plaintiff's condition from healthy to seriously ill, debilitated and incapacitated, was the direct result of the incompetent, negligent, wrongful and deliberately indifferent conduct on the part of the United States, the BOP and their agents and employees, including but not limited to Warden Craig Apker, Unit Manager L. Lindsley, Dr. Roscoe Ramsey and Dr. Carlos Duchesne, who either ignored his condition or delayed necessary treatment and medications, denying him essential medical care.

21.     After he first learned his condition was not curable on or about May 17, 2017, Mr. Sui commenced a federal action in this Court on February 8, 2019, asserting an FTCA claim and violation of his constitutional rights under *Bivens v. Six Unknown Federal Narcotics Agents* and its progeny

3

22.     On April 6, 2021, the Court entered an order dismissing the FTCA action without prejudice and holding that Mr. Suri had failed to exhaust his administrative remedies because he never requested a "sum certain" from BOP. Plaintiff argued that the Complaint, if it were to be dismissed, should be dismissed without prejudice since he had commenced his federal action well within two years after his spinal surgery and thus still had additional time to bring an administrative claim. The Court dismissed the FTCA claim without prejudice, stating that the "'[f]ailure to exhaust administrative remedies is often a temporary, curable, procedural flaw.' *Snider v. Melindez,*199 F.3d 108, 111 (2d Cir. 1999). Where, as here, 'a plaintiff may cure the defect by pursuing administrative procedures to their conclusion and then [should the administrative process fail to provide the desired relief] reinstituting [his] suit, dismissal without prejudice is appropriate.' *Greene v. Desousa*, No. 14 Civ. 6290 (SJF) (AYS), 2016 WL 3460376, at *3 (E.D.N.Y. June 21, 2016). Furthermore, the remaining *Bivens* claims were transferred by the Court to the Eastern District of North Carolina.

23.     Following the dismissal of the FTCA claim without prejudice, Mr. Suri filed with the BOP an administrative claim, received on May 14, 2021, seeking a sum certain of $60,000,000. The BOP by letter from the Department of Justice mailed on August 2, 2021, denied Mr. Suri's administrative claim.

24.     By way of background, Plaintiff was arrested on December 21, 2009, and released on bail. He was charged in the United States District Court for the Southern District of New York with conspiracy to commit bank fraud and bank fraud. On May 28, 2010, following a twelve-day trial, Plaintiff was convicted of the charged offenses. He was sentenced on April 12, 2011, by the Honorable Sidney H. Stein to 60 months imprisonment, followed by four years of

4

supervised release. Plaintiff voluntarily surrendered to the custody of the BOP on or about March 1, 2012. He was taken to the Metropolitan Detention Center ("MDC") in Brooklyn.

25.     During his time in BOP custody, Plaintiff was incarcerated in several BOP facilities, including the MDC in Brooklyn, a facility in Philadelphia, Pennsylvania, FCI Lewisburg (Camp) in Pennsylvania, and FCI and FMC Butner in North Carolina. At each of these BOP facilities, Plaintiff's medical needs either were ignored or addressed negligently, incompetently, wrongfully or with deliberate indifference in violation of Plaintiff's rights.

26.     Prior to his imprisonment, Plaintiff was able to walk and go ballroom dancing with his wife. While he was receiving medical care during this period, he was not suffering from any serious debilitating medical conditions.

27.     Following his imprisonment at the MDC on or about March 1, 2012, Plaintiff requested from BOP medical staff Flomax, a prostate medication that he had been prescribed for several years to maintain a healthy prostate. In addition, Plaintiff requested treatment – physical therapy and acupuncture – for spinal stenosis, which he had been receiving prior to his incarceration to maintain and strengthen his mobility. These requests were ignored by MDC staff and the BOP refused to provide Plaintiff with Flomax or any of the other requested treatments.

28.     On or about March 13, 2012, Plaintiff was transferred from MDC to a BOP facility in Philadelphia. On or about March 15, 2012, Plaintiff was admitted on an emergency basis to a local hospital with a severe cellulitis infection. He was subsequently transferred to Lewisburg Camp ("Lewisburg").

## Plaintiff's Cardiac Condition

29.     In years prior to entering BOP custody, Plaintiff underwent procedures

for the placement of stents in his arteries. These facts were told to BOP personnel and presumably were recorded by BOP when Plaintiff entered into BOP custody. They were brought personally by Plaintiff to Warden Apker's attention at Butner at least as early as November 2012, if not earlier.

30.     By letter dated January 9, 2013, Plaintiff wrote to his Unit Manager, Ms. L. Lindsley, and requested a nuclear Stress test regarding blockages in his arteries. Warden Apker was sent a copy of this letter.

31.     On or about January 30, 2013, Plaintiff underwent a nuclear stress test which showed arterial blockages. For the next several months, there was no follow up, notwithstanding oral and written requests by Plaintiff.

32.     In April 2014, when Plaintiff started suffering from shortness of breath, BOP sent him for a consultation with Dr. Jeffrey Klein, a cardiologist at the University of North Carolina Hospital at Chapel Hill, NC. Dr. Ramsey was advised of these facts.

33.     Dr. Klein noted that Plaintiff suffered from coronary heart disease, hypertension, hyperlidimia and mild to moderate aortic stenosis. He recommended that they proceed with a myocardial PET scan to diagnose Plaintiff's heart diseases and, if necessary, to proceed with left heart catheterization. Dr. Klein scheduled a follow-up appointment 4 to 6 weeks later to reassess symptoms, review Plaintiff's PET results and obtain an echocardiogram at that time.

34.     The BOP did not make arrangements for Plaintiff to undergo the PET scan and did not schedule the follow-up appointment with Dr. Klein. Plaintiff continued to experience shortness of breath and walking issues and pleaded with BOP representatives to allow him to have his follow-up visit with Dr. Klein.

6

35.     When Plaintiff saw Dr. Ramsey on May 20, 2014, Dr. Ramsey finally submitted a new consultation request to UNC cardiology for a myocardial PET scan in accordance with Dr. Klein's previous recommendation.

36.     Plaintiff continued to ask to see Dr. Klein for the recommended treatment as his condition worsened. His requests were rejected. Indeed, with deliberate indifference and in reckless disregard of Mr. Suri's urgent medical needs, that follow-up appointment with Dr. Klein was canceled by BOP as "not medically necessary" on June 3, 2014. All of these matters were brought to the attention of Ms. Lindsley, Dr. Ramsey and Warden Apker.

37.     On June 12, 2014, Dr. Ramsey negligently described Plaintiff's heart, spine, and prostate health issues by characterizing Plaintiff's chronic and serious medical condition as "related to the aging process."

38.     Plaintiff's condition continued to deteriorate. He complained about ongoing dizziness and balance issues, and the complaints were forwarded to Dr. Ramsey. In one such communication on July 17, 2014, Plaintiff reiterated Dr. Klein's recommendation, stating, "I don't need cardio consultation, I need a surgeon for possible angiogram catheterization if the stress/PET scan confirms blockage."

39.     Suffering from high blood pressure for the first time in three years, on August 2, 2014, Plaintiff again implored BOP and Dr. Ramsey to send him to Dr. Klein for a possible angiogram catheterization, to no avail.

40.     Months passed before Warden Apker and Dr. Ramsey finally determined to refer Mr. Suri for an in-house consult to determine whether to follow Dr. Klein's April recommendations. For some reason, the BOP also discontinued Plaintiff's Plavix medication, which Plaintiff had been prescribed for years and which was essential for his heart health. Dr.

Duchesne, at Butner, then approved a request for a cardiology consult for a second opinion to determine whether Plaintiff's Plavix medication was still necessary and the appropriateness of nuclear stress testing.

41.     On October 21, 2014, Plaintiff was seen by Dr. Benjamin Conway, who stated that "it is not absolutely necessary to do a myocardial PET scan at UNC and that starting with a nuclear stress test here at Butner would be fine. He (Plaintiff) may need to undergo cardiac catheterization." And with respect to the Plavix medication, which Plaintiff had been taking since 2004 and had been told by his physicians he should take for the rest of his life, Dr. Conway stated that while Plaintiff is "quite attached to the drug, . . . it is not absolutely necessary that he stay on the drug but dual antiplatelet therapy ongoingly [sic] could be used for continued aggressive secondary prevention of atherosclerosis. Given that the patient would like to be aggressive about secondary prevention, I think it is reasonable, but not absolutely necessary to continue the clopidrogel." Chlopidrogel is a generic form of Plavix.

42.     Dr. Conway's report, like other reports relating to Plaintiff's medical issues, was reviewed by Dr. Ramsey, and Plaintiff raised the Plavix issue with Warden Apker.

43.     On November 17, 2014, Plaintiff was informed that his Plavix heart medication had been discontinued and was no longer approved by BOP (more than likely as a cost-cutting measure).

44.     Upon learning of this determination, Plaintiff begged BOP repeatedly for the Plavix. He explained he had been on the drug since 2004 at the behest of his cardiologists and had been advised to take Plavix every day for the rest of his life. In response, BOP informed him that his request for the drug was denied. Plaintiff brought this to the attention of Warden Apker, Dr. Ramsey, Unit Manager Lindsley and anyone else at the facility who would listen to him.

45.     On more than seven separate occasions, Plaintiff brought the seriousness of the situation to the attention of the BOP, including Dr. Ramsey, the warden and unit administrator. In response to his repeated requests for Plavix, he was informed that his primary care provider (Dr. Ramsey) had said he should "continue on aspirin." Plaintiff's further complaints that his vertigo had gotten worse since he discontinued Plavix fell upon deaf ears.

46.     Plaintiff continued thereafter to plead for the Plavix to be restored and to receive the heart catheterization Dr. Klein and other doctors believed might be necessary.

47.     On December 15, 2014, Plaintiff communicated directly with Dr. Duchesne, Clinical Director, and specifically informed him of Dr. Klein's diagnosis and that he had been suffering from shortness of breath, and needed the Plavix to prevent artherosclerosis. Nothing happened.

48.     In mid-March of 2015, Mr. Suri complained of severe chest pains and suffered a heart attack. He ultimately had to undergo a balloon angioplasty and was released back to Butner from a community hospital on March 18, 2015.

49.     At some time thereafter, BOP determined to re-start Plaintiff's Plavix heart medication, daily. It was too little, too late as subsequent events make plain.

50.     On April 14, 2015, Plaintiff reported sharp chest pains and was transferred to a local hospital before being returned to Butner on April 17.

51.     He reported continuing chest pains throughout the months of April and May until he was finally transferred to Duke University Medical Center in mid-June where he received the tests that Dr. Klein had prescribed in April, 2014, over one year previously, and was diagnosed with internal hemorrhaging and aortic valve endocarditis. Plaintiff underwent bypass surgery,

valve replacement and valve repair surgery on June 19, 2015.  He was discharged on July 4, 2015.

52.     The bypass, valve replacement and other valve repairs that became necessary due to his lack of proper treatment at BOP continues to have a major negative impact on his life and well-being.

**Plaintiff's Spinal Stenosis and Other Lumbar Issues**

53.     Plaintiff frequently engaged in ballroom dancing with his wife prior to his entry into BOP custody.

54.     Upon surrendering to the BOP on or about March 1, 2012, Plaintiff walked in under his own power.  Upon his release in 2016, he left BOP custody with a damaged heart, prostate cancer, weakened, and with severely limited mobility.

55.     As early as at least January, 2013, Unit Manager Lindsley and Warden Apker were on notice that Plaintiff was suffering from spinal pain and discomfort.

56.     On April 2, 2013, Plaintiff was diagnosed with severe lower lumbar facet athropathy with resulting listhesis at the L4-5 and L5-S1 levels.

57.     Plaintiff's condition worsened as he did not receive the appropriate treatment and on October 28, 2013, a radiological report confirmed a "1 cm anterolisthesis of L4 on L5 and a 1.1 cm anterolisthesis of L5 on S1," findings consistent with "hemangiomas at several disk space levels."

58.     Plaintiff had repeated contact with Dr. Ramsey and Warden Apker, both orally and in writing, regarding his deteriorating condition.  Further, as Plaintiff experienced foot drop and moved from a walker to a wheelchair, it was readily apparent to all that he had a serious

10

spinal deterioration. For over a year nothing was done to address Plaintiff's worsening condition.

59.    Plaintiff's condition progressively deteriorated to the point that in December 2014 he was diagnosed with a marked difficulty with standing and with balance issues as a result of severe stenosis with lithesis. The consulting physician referred by Butner, Dr. Price, urgently recommended an MRI and lumbosacral spine film for evaluation. He noted that "Patient will most likely be a surgical candidate." Again, nothing was done.

60.    Months passed and Plaintiff did not receive the surgery he needed on his back.

61.    By March 2015, Plaintiff complained that he was having difficulty walking, even with the walker. In response, he was advised that his orthopedic team had decided to defer to his Primary Care team for the "decision to send [him] for any ~~required~~ further treatment/ surgery for [his] back." (Deletion in original). Nothing happened.

62.    As an excuse for inaction for almost the preceding two years, after his heart surgery in June 2015, BOP indicated "neuro surgery unable to perform corrective procedure . . . due to clinical instability at this time." On June 11, 2015, BOP indicated that "Spinal stenosis likely leading to paraplegia but unable to operate due to infection and aortic insufficiency."

63.    By July 2015, BOP indicated that surgery was recommended for Plaintiff upon his recovery from heart surgery, once clinically stable. Plaintiff was unable to stand independently and complained that his feet felt numb and he was unable to move them until he had the necessary spinal surgery, which he expected would occur within a month.

64.    Indeed, Plaintiff's cardiologist, Dr. Haney, had urged that back surgery take place as soon as possible because of the negative impact on the heart.

65.    From July 2015 through the date of Plaintiff's release, despite the looming danger

of paraplegia due to the worsening spinal stenosis, BOP failed to provide the necessary surgical treatment on Plaintiff's back and spine.

66.     Rather than perform the necessary surgery, BOP instead referred Plaintiff for another neurology consult on November 18, 2015. At that point Plaintiff refused the consult because by then it was too late to have the surgery, recuperate and receive the follow-up treatment needed as Plaintiff anticipated being released in early 2016. He was in fact released on or about April 26, 2016. He expected that with proper medical care and surgery, his mobility issues would be resolved.

67.     After his release from prison, on May 17, 2017, Plaintiff had spinal surgery performed in New York at Mount Sinai Hospital. Due at least in part to the extensive and extreme delay by BOP in treatment, however, the surgery was unsuccessful in restoring Plaintiff's mobility. The compressed nerves at the lower spine, which had led to muscle disorder and foot drop, could no longer be activated. The surgery helped ensure that Mr. Suri's condition did not progress to the level where he lost total control of his urinary or bowel functions. His doctors determined at that time, and informed Mr. Suri at that time, that his condition is one that will not be curative.

68.     To this date, Plaintiff continues to suffer certain numbness in his extremities, he is unable to walk, even with a walker, more than a very short distance; Plaintiff basically is confined to a wheelchair and requires 24-hour around-the-clock assistance from a healthcare aide, substantially due to the delay, negligence and deliberate indifference and disregard on the part of the BOP and its agents and employees, including but not limited to Warden Apker, Dr. Ramsey. Dr. Duchesne, and Unit Manager Lindsley.

12

### Plaintiff's Prostate Cancer

69.     On or about August 14, 2012, while Plaintiff was in USP Lewisburg, he was diagnosed with prostate cancer, Gleason 3+4=7, by Dr. Raj Chopra at that facility.  On August 23, 2012, Dr. Chopra's recommended treatment of "radical . . . prostatectomy or Brachy Therapy with Simpson for 1 year."  Dr. Chopra contemplated that Plaintiff would receive the Brachy Treatment at a local hospital -- Geisinger Medical Center in nearby Danville, PA.

70.     Upon learning that he had prostate cancer, Plaintiff was anxious to receive the recommended Brachy treatment as quickly as possible.

71.     Rather than following the advice of Dr. Chopra and sending Plaintiff to Geisinger Hospital or other local medical facilities that could provide him with the recommended Brachy treatment, the camp medical administrator Steven Brown and BOP decided instead to transfer Plaintiff, on or about September 26, 2012, to Butner, North Carolina, to a facility purportedly equipped to treat prostate cancer.  In fact, Butner did not offer the Brachy therapy treatment Plaintiff needed and which Dr. Chopra had recommended.

72.     Upon arriving at Butner, during a clinical visit on September 28, 2012, a BOP doctor, Dr. Pesante, indicated that he would present Plaintiff's prostate cancer care to "the tumor board."

73.     Although it is unclear whether Plaintiff's case ever was examined by the tumor board, Butner offered Plaintiff external beam radiation, a different treatment with more severe potential complications and negative after-effects than that recommended by the BOP physician, Dr. Chopra, at Lewisburg.  In addition, Dr. Daniel Cuscela, an oncologist at Butner, and Dr. Michael Brodhersen, Plaintiff's urologist in New York, concurred with Dr. Chopra that Brachy

therapy was the most appropriate course of treatment for Plaintiff given his individual medical conditions. Dr. Cuscela concurred in December, 2012.

74.     On November 2, 2012, Plaintiff's wife, who was dying of Stage-4 colon cancer, wrote directly to Warden Craig Apker to inform him of Mr. Suri's serious medical issues, including both his prostate cancer and his cardiac issues.

75.     Plaintiff pleaded repeatedly for the recommended Brachy treatment. For example, in December, 2012, he communicated his serious concerns about his cancer diagnosis and lack of treatment, and his cardiac and vascular health issues to the Director for the Mid-Atlantic Region, Warden Craig Apker, and Unit Manager Ms. Lindsley, seeking a transfer to New York so that he might receive the recommended medical treatment.

76.     In January 2013, Plaintiff again raised his lack of treatment for cancer, spinal stenosis and cardiac issues with the Unit Manager Lindsley, and with the Warden, Craig Apker, and begged to be transferred to New York City so he could receive treatment for his cancer and also be near his wife, who was dying of stage-4 colon cancer. His many requests were denied.

77.     On April 24, 2013, Plaintiff again brought the matter of his lack of medical care to the attention of Judge Stein, the judge who had sentenced him, and the Assistant United States Attorney who prosecuted him.

78.     He begged for treatment, begged to be transferred to New York, where he could receive the Brachy therapy, and asked for compassionate release. The Regional Director on March 13, 2013, denied his request and directed him to submit a request for compassionate release to his primary care team for their consideration. That request was subsequently denied.

79.     In April 2013, Plaintiff discussed his prostate cancer treatment with BOP medical staff, who responded by simply stating the recommended Brachy treatment was not available at

Butner. He made further complaints, including, for example, on April 16 to Dr. Nwude, on June 5 through the health administrator system, on October 3 to Dr. Coughlin, and on December 15, 2013 to Dr. Duchesne, all to no avail.

80.     Dr. Chopra at Lewisburg Camp had recommended Brachy therapy. If Butner did not offer the Brachy treatment, it remains unclear why Plaintiff was transferred away from a facility that offered the recommended treatment to one that did not.

81.     Throughout 2014, Plaintiff continued to request the Brach therapy. He brought his concerns both verbally and in writing to Warden Apker, to the facility's medical board, to the Health System Administrator and to Dr. Ramsey, all to no avail.

82.     By April 20, 2015, Plaintiff's PSA was recorded at 16.01 (when a normal reading is in the 0.0 to 4.0 range), which was very high and dangerous.

83.     Plaintiff was examined on October 13, 2015, by Dr. Adrian Ogle, who explained that a PSA test by itself is not a surrogate for progression of prostate cancer and that Plaintiff needed a repeat biopsy of his prostate. Although Plaintiff agreed, he did not receive the biopsy.

84.     After his release from custody in 2016, Plaintiff underwent successful treatment at Memorial Sloan Kettering Cancer Center in New York, which included the Brachy therapy previously recommended by Dr. Chopra back in 2012, though the four-year delay contributed to Plaintiff's loss of some prostate function.

85.     Plaintiff currently suffers from bladder issues, erectile dysfunction and loss of related prostate functions. Had Plaintiff been treated promptly by the BOP and its agents and employees with the Brachy therapy recommended by Dr. Chopra years earlier, these present difficulties may not have occurred, or if they did occur, the greater likelihood is that they would have occurred to a far lesser degree.

86.   Plaintiff was damaged by the negligence and deliberate indifference on the part of the BOP and its agents and employees, including but not limited to Warden Apker, Unit Manager Lindsley, Dr. Ramsey and Dr. Duchesne.

**Plaintiff's Cellulitis**

87.   On March 19, 2012, while at the FDC Philadelphia, Plaintiff was admitted to a local hospital with a swollen left leg and in a great deal of pain, suffering from dizziness and nausea for the preceding three days.

88.   He was diagnosed with left leg cellulitis and treated for an ulcer on his left foot.

89.   Cellulitis is an infection of the skin and the tissue beneath it caused by germs that enter the body through cuts and sores.

90.   Plaintiff contracted the cellulitis from the shower facilities, either at FDC Philadelphia or at the MDC in Brooklyn, as a result of the negligent maintenance of those facilities and/or the deliberate disregard and indifference to the need to maintain those facilities in a sanitary condition.

91.   Plaintiff has had recurrences of the cellulitis. For example, in November 2014, a nurse at Butner suggested he obtain a higher dosage of antibiotics since his leg was swollen and red. In response, Plaintiff was informed his order for antibiotics had expired.

92.   Plaintiff still suffers from the effects of the cellulitis. He was informed by his doctors that the infection will not leave his body for the rest of his life.

93.   Infection is a recognized cause of endocarditis.

### Mr. Suri's Complaints to BOP and the Court About His Medical Treatment

94.     Mr. Suri regularly and repeatedly communicated his complaints about his lack of

proper medical treatment, verbally and in writing, to his unit manager, Warden Apker, Dr.

Ramsey, Dr. Duchesne, Plaintiff's treating physicians at BOP, and to other BOP administrators.

95.     Plaintiff's wife before dying alone, isolated from Plaintiff, her primary caretaker,

wrote to Warden Thomas at Lewisburg on July 17, 2012, notifying him that by denying Plaintiff

his medications and refusing follow-up diagnoses, BOP had deprived him of his civil rights.

96.     Plaintiff also specifically notified BOP in writing on January 15, 2013, that it was

subjecting itself to liability by denying him timely and proper medical treatment.

97.     Throughout 2012, 2013 and 2014, Plaintiff also wrote letters to Judge Stein,

attaching his complaints and correspondence with the BOP and detailing his medical needs and

lack of adequate treatment he was receiving from the BOP.  In July 2012, Plaintiff wrote a letter

to Judge Stein informing the Court of his cancer diagnosis and BOP's refusal to provide him

with Flomax.  He also sent the letter to the Assistant United States Attorney Lee Renzin.

98.     On April 12, 2013, Plaintiff again wrote to Judge Stein, stating he had submitted

multiple requests to the BOP related to his need for medical treatment and the BOP's refusal to

provide any.

99.     On July 9, 2014, Plaintiff again wrote a letter to Judge Stein with his attachments

of his complaints to BOP staff, stating that the BOP had not provided any – no less proper –

treatment related to his prostate, cardiovascular and spinal conditions.

### PLAINTIFF'S INJURIES AND DAMAGES

100.    As a direct and proximate consequence of the aforementioned actions by the

Defendants, Mr. Suri:

a.      Suffered severe physical injuries, including loss of mobility, inability to walk, weakness, shortness of breath, permanent damage to his cardiovascular system, prostate and bladder dysfunction, erectile dysfunction, recurrent cellulitis, and physical and emotional pain and suffering;

b.      Suffered psychological injuries;

c.      Continues to suffer from physical and psychological injuries, emotional and mental anguish and pain; and

d.      Incurred other items of attendant damages.

## FIRST CAUSE OF ACTION

### FEDERAL TORT CLAIMS ACT
### AGAINST DEFENDANTS UNITED STATES OF AMERICA AND THE BOP

101.    Plaintiff hereby incorporates the allegations set forth in Paragraphs 1 through 100 as fully set forth herein.

102.    Defendant United States of America and BOP, by and through the negligence, malpractice and deliberate indifference of BOP medical and other staff, is liable under the Federal Tort Claims Act for injuries resulting from the failure by the identified individuals and the BOP to provide proper, adequate and timely medical treatment to Plaintiff.

103.    The identified individuals and the BOP owed Plaintiff a duty to provide, and see to it that Plaintiff received, proper, adequate and timely medical care.

104.    As alleged above, the United States and BOP, through its employees and agents breached this duty of care by failing to provide or arrange for proper, timely and adequate medical care for Plaintiff.

105.    The United States' and BOP's wrongful conduct caused Plaintiff severe and permanent injuries, physical pain and suffering, mental and emotional pain and suffering and loss of enjoyment and quality of life.

## JURY DEMAND

106.    Plaintiff hereby demands trial by jury of all issues properly triable thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a.    For compensatory damages in the amount of $60,000,000.00;

b.    For punitive damages in an amount to be determined;

c.    For reasonable attorneys' fees, together with costs and disbursements and this action;

d.    For pre-judgment interest as allowed by law; and

e.    For such other and further relief as this Court may deem just and proper.

Dated:  September 27, 2021
        New York, New York

Yours, etc.

_John F. Kaley (JK: 3598)_
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, New York 10007
Ph: (212) 619-3730
Fax: (212) 962-5037

Anthony Cecutti (AC 5830)
217 Broadway, Suite 707
New York, New York 10007
Ph: (212) 619-3730
Fax: (212) 962-5037

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BILL SURI,                                              :

                Plaintiff,                        :          **19-CV-0803 (LDH) (ST)**

          vs.                                       :          **CERTIFICATE OF MERIT**

THE UNITED STATES OF AMERICA and            :
BUREAU OF PRISONS, CRAIG APKER,
DR. ROSCOE RAMSEY, DR. CARLOS DUCHESNE
et al.,

                Defendants.                      :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      I, John F. Kaley, attorney for the plaintiff, Bill Suri, do hereby certify that I have reviewed the facts of this case and consulted with at least one physician who is licensed to practice in the State of New York and who I reasonably believe is knowledgeable in the relevant issues involved in this particular action and that I have concluded on the basis of that review and consultation that there is reasonable basis for the commencement of this action.

Dated: September 27, 2021
      New York, New York

                                  John F. Kaley
                                  Doar Rieck Kaley & Mack
                                  217 Broadway, Suite 707
                                  New York, New York 10007
                                  Ph: (212) 619-3730
                                  Fax: (212) 962-5037
                                  Attorney for Plaintiff